

## OFFICE OF THE ATTORNEY GENERAL OF TEXAS
### AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

March 15, 1939

Mr. L. L. Steele
Farmers State Bank Building
Mexia, Texas

Mr. Thomas G. Pollard
Attorney at Law
Tyler, Texas

Mrs. W. R. Potter
Bowie, Texas

Gentlemen:

Opinion No. O-410
Re: Eligibility of president of
Texas Technological College

On February 14, 1939, we received a letter from Mr. L. L. Steele enclosing a copy of the minutes of the Board of Directors of Texas Technological College showing the business which was transacted by said Board on November 26, 1938.

Such minutes show that Honorable Clifford B. Jones, Chairman of the Board, and all eight other members were present. That after certain other business had been transacted, a motion was made by Mrs. Haley, seconded by Mr. Sneed, that Mr. Jones be elected president of Texas Technological College. At that point, Mr. Pollard raised the point of order that Mr. Jones could not be considered for the position for the reason that he was a member of the Board, and for the further reason that if he should resign he would still be disqualified to be president. Vice-Chairman Wells overruled the point of order, whereupon Mr. Pollard appealed to the Board and requested a vote which was had with the result that Mr. Pollard's point of order was sustained. The Board recessed for fifteen minutes. When the Board re-convened, the Vice-Chairman reported that he had a copy of a telegram which indicated that Mr. Jones had wired to the Governor his resignation as a member of the Board. At that point, Mr. Pollard raised the further point of order that the Board could not consider Mr. Jones for the position of president as the message conveying the resignation had just been sent to the Governor and could not be acted

on as the Governor was away from his office on a deer hunt, and that Mr. Jones still remained a member until the Governor could officially accept his resignation. The point of order was overruled. Then the motion was made by Mrs. Haley, seconded by Mr. Sneed, nominating Mr. Jones as president of the college. A vote was taken in which Mrs. Haley, Mr. Sneed, Mr. West and Mr. Thompson voted "aye", and Mr. Pollard, Mrs. Potter and Mr. Steele voted "no", and the Vice-Chairman, Mr. Wells requested that the record show that he had voted "aye".

In his letter to us, Mr. Steele requests our opinion in response to two questions, via:

"1. Can the members of the Board of Directors of Texas Technological College, a state institution, legally appoint and employ one of its existing members as president of such institution?"

"2. Does a member of such Board render himself eligible for such office by resigning during the session held for the election of a president and for the purpose of being elected to such office?"

On March 2, 1939, we received a letter from Mrs. W. R. Potter and on March 1, 1939, a letter from Mr. Thomas G. Pollard, other Board members, each requesting our opinion as to the validity of the appointment of Mr. Jones as president of Texas Technological College.

Aside from the above facts, we have also ascertained the following: On December 1, 1938, the Governor of Texas accepted in writing Mr. Jones' resignation, which had been thus wired to him on November 26. On December 1, 1938, the Governor appointed Mark McGee to succeed Mr. Jones, who qualified on December 6, 1938, and who was confirmed by the Senate on February 6, 1939. Mr. Jones' regular six year term as a member of the Board of Directors expired on February 19, 1937, and we find no record indicating re-appointment, from which it appears that his service since that time was in the nature of holding over awaiting the appointment and qualification of a successor.

In addition to the above questions, Honorable Geo. H. Sheppard, Comptroller, has requested our opinion as to whether he should forward to Mr. Jones a warrant in payment of the latter's salary for the month of February, 1939.

These questions are thus properly before us, and, under Article 4399 of the Revised Civil Statutes, we are required to answer the same.

Article 2630, Revised Civil Statutes, vests the control of Texas Technological College in a Board of nine directors who shall

Mr. L. L. Steele, et al., March 15, 1939, Page 3

hold office for a period of six years.

Article 16, Section 30a, Constitution of Texas, provides:

"The Legislature may provide by law that the
members of the Board of Regents of the State Uni-
versity and boards of trustees or managers of the
educational, eleemosynary, and penal institutions
of the State, and such boards as have been, or may
hereafter be established by law, may hold their re-
spective offices for the term of six (6) years, *
* * *"

Article 7, Section 16, Constitution of Texas, reads as fol-
lows:

"The Legislature shall fix by law the terms
of all officers of the public school system, and
of the State institutions of higher education,
inclusive, and the terms of members of the respec-
tive boards, not to exceed six years."

Article 16, Section 17, of the Constitution of Texas, is as
follows:

"All officers within this State shall con-
tinue to perform the duties of their offices un-
til their successors shall be duly qualified."

We take the following quotation from Tooele County vs. De
La Mare, 59 Pac. (2d) 1155, by the Supreme Court of Utah:

"According to some authorities the right
to relinquish an office is absolute and effec-
tive even though not accepted by the proper of-
ficers. State v. Fitts, 49 Ala. 402; People v.
Porter, 6 Cal. 26; Meeker v. Reed, 70 Cal. App.
119, 232 P. 760; Gates v. Delaware County, supra;
State v. Lincoln, 4 Neb. 260; State v. Clarke, 3
Nev. 566. The great weight of authority, however,
is to the effect that a resignation is not effec-
tive until it is accepted by the proper authori-
ties. Thompson v. United States, 103 U.S. 480,
26 L. Ed. 521; Edwards v. United States, 103 U.
S. 471, 26 L. Ed. 314; Badger v. United States,
93 U.S. 599, 23 L. Ed. 991; People v. Williams,
145 Ill. 573, 33 N.E. 849, 24 L.R.A. 492, 36 Am.
St. Rep. 514; State v. Huff, 172 Ind. 1, 87 N.E.
141, 139 Am. St. Rep. 365; State v. Council Grove
Board of Education, 106 Kan. 101, 193 P. 1074;
Patrick v. Hagins, 41 S.W. 51, 19 Ky. Law Rep.

482; Clark v. Detroit Board of Education, 112 Mich. 656, 71 N.W. 117; Fryer v. Norton, 67 N. J. Law 537, 538, 52 A. 476; Van Oredall v. Hazard, 3 Hill (N.Y.) 243; State v. Cleveland Dist. Board of Education, 23 Ohio Cir. Ct. R. (N.S.) 98; Commonwealth v. Hess, 2 Pa. Dist. & Co. R. 550; State v. Stickley, 80 S.C. 64, 61 S.E. 211, 128 Am. St. Rep. 855, 15 Ann. Cas. 136; State v. Bush, 141 Tenn. 229, 208 S.W. 607; Coleman v. Sands, 87 Va. 689, 13 S.E. 148; State v. Kitsap County Superior Court, 46 Wash. 615, 91 P. 4, 12 L.R.A. (N.S.) 1010, 123 Am. St. Rep. 948, 15 Ann. Cas. 870; State v. Jefferis, 26 Wyo. 115, 178 P. 909."

Under Section 17, of Article 16, Constitution of Texas, the rule in Texas goes still further and holds that an officer's resignation is not effective until his successor qualifies. Keen v. Featherston, 69 S.W. 983, error refused; El Paso & S.W. R. Co. v. Ankenbauer, 175 S.W. 1090; Ringling v. Hempstead, 193 Fed. 596; McGhee vs. Dickey, 23 S.W. 404, 34 Tex. Jur. 571.

In Budger vs. U.S., 93 U.S. 599, 23 L. Ed. 991, under a constitutional provision of Illinois, almost identical with our own, the Supreme Court held that the qualification of a successor was necessary to the effectiveness of a resignation.

To this general rule there are exceptions, as in State vs. Valentine, 198 S.W. 1007, and Lowe vs. State, 201 S.W. 986. Suffice it to say, the case under consideration did not fall within any such exception on November 26, 1938, when the Board voted to make Mr. Jones president of this institution.

In the case of Keen vs. Featherston, supra, the facts were as follows: Section 170 was public free school land, which had been sold to Steele. On January 25, 1900, the sale to Steele was cancelled for abandonment, and on the same day Keen made application to purchase the same as additional grazing land. On the same day the commissioner mailed a letter to the clerk notifying him that the land had been re-classified as dry grazing land, and placed on the market at $1.00 per acre and to let the records so show. This letter was not received until January 30, 1900. Featherston was in the middle of a term as county surveyor. He tendered his unconditional resignation on January 14, 1900, for the express purpose of buying the land. On February 13, 1900, the commissioners' court accepted his resignation, but appointed no successor. On February 14 he filed another application to purchase. As said by the court, the only material question in the case was whether Featherston was disqualified from purchasing the land upon his application of February 14 by reason of being county surveyor. The court pointed out that the then Article

:. L. L. Steele, et al., March 15, 1939, Page 5

:3, Penal Code, prohibited a county surveyor from being concerned i the purchase of any public land, and quoted the above Article 16, )ction 17, providing that all officers shall hold over until quali-.cation of their successors.

We quote from the opinion as follows:

"This provision of our Constitution seems to be mandatory. It does not say, nor does it mean, that officers may perform the duties of their of-fices until their successors are qualified, but that they shall do it. Such is the contract be-tween them and the State when they take the office, and there are many good reasons why the constitu-tion should be thus interpreted. Some of them are that the functions of government must not cease, and the public records of the office must be pre-served, and handed over to a successor. * * *

"'Continuing to perform the duties' of an of-fice is 'holding the office,' and hence we con-clude that Mr. Featherstone was still surveyor of Stonewall county when he made his application of February 14, 1900, and that, as our penal statute imposes a penalty on him for purchasing the sec-tion in controversy, he was prohibited and dis-qualified from doing so.

"The judgment is therefore reversed, and is here rendered in favor of appellant."

There is no escape from the proposition that Mr. Jones as still a member of the Board of Directors when that body took he action of November 26, 1938, which must be relied upon to sus-ain his position as president of Texas Technological College.

It makes no difference whether Mr. Jones was in the midst f a regular term of office which began on February 19, 1937, or hether he was holding over after the expiration of his regular erm which ended on that date. For, under Article 16, Section 17, onstitution of Texas, ho was just as much a de jure officer in the atter event as the former. State vs. Jordan, 26 S.W. (2d) 921, er-or dismissed.

The general rule touching on the subject in question, in the absence of statute bearing on the same, is set forth in Volume 16, page 940, Corpus Juris, as follows:

"It is contrary to the policy of the law for an officer to use his official appointing power to place himself in office, so that, even in the

Mr. L. L. Steele, et al., March 15, 1939, Page 6

absence of a statutory inhibition, all officers
who have the appointing power are disqualified
for appointment to the offices to which they may
appoint; nor can an appointing board appoint one
of its members to an office, even though his vote
is not essential to a majority in favor of his
appointment, and although he was not present when
the appointment was made, and notwithstanding his
term in the appointing body was about to expire;
nor can the result be accomplished indirectly by
his resignation with the intention that his suc-
cessor shall cast his vote for him."

Holding that a County Judge was not eligible to accept
compensable employment as attorney for the county of which he was
judge, the Supreme Court in Ehlenger vs. Clark, 8 S.W. (2d) 666,
said:

"It is because of the obvious incompatibil-
ity of being both a member of a body making the
appointment and an appointee of that body that
the courts have with great unanimity throughout
the country declared that all officers who have
the appointing power are disqualified for appoint-
ment to the offices to which they may appoint. 29
Cyc. 1381; 22 R.C.L. 414, Sec. 56."

In Parrish vs. Town of Adel, 86 S.E. 1095, before the Su-
preme Court of Georgia, the town council had elected the mayor and
two of the councilmen as assessors. Certain taxpayers sought to en-
join executions issued against them on the ground that the assess-
ment was made by an illegally appointed board of assessors. After
holding that the appointments were illegal as against public policy
and that the appointees were not de jure officers, in connection with
its further holding that they were not even de facto officers and
that their acts were wholly void, the court said:

"Many authorities will be found to support
the general rule that the mere ineligibility of
the officer to an existing legal office will not
invalidate his official acts, under the de facto
doctrine. But where the commission or record evi-
dencing the appointment shows on its face that the
appointment is without legal authority, the ineli-
gibility of the appointee does not depend upon the
possibility of that fact being unknown to the ap-
pointing power, and the general rule is not appli-
cable to such case. The very power which was ex-
ercised in the appointment in this case showed not
only that the assessors were ineligible, but also

Mr. L. L. Steele, et al., March 15, 1959, Page 7

that the appointing power was without authority
to make the appointment. * * *

"The power to appoint citizens who were
freeholders of the town did not include the power
to appoint themselves as assessors; * * *"

In the case of State vs. Dean, 176 Pac. 633, by the Supreme Court of Kansas, the Panama-Pacific Exposition had appointed one of its members secretary of the commission, and the State was suing for the recovery back of the compensation paid him as such. He had not participated with the other members of the commission in his selection as secretary, or in the fixing of his compensation, or the approval of his vouchers. He had faithfully performed the duties of the position. We quote from the opinion:

"It is quite clear that a very unfortunate,
but perfectly innocent, mistake has been made.
The commission could no more pay one of its own
members compensation to do work in furtherance
of the object of the creation of the commission
than it could let to itself the contracts for the
erection of the exposition buildings. It is much
debated in the briefs whether or not the members
of the commission held 'office', within the mean-
ing of the statute prohibiting officers of various
kinds from doing or having done for their own prof-
it any work in and about their offices, or over
which they have supervision, direction, or control.
It is not necessary to decide the question. The
members of the commission were charged with the exe-
cution of an important public trust, as agents, at
least, of the state, and the same public policy
which underlies the statute forbids an agent of a
private individual, even, or any one acting in a
fiduciary relation, to tempt his own loyalty by
entering into any transaction which requires him
to play a dual role. It makes no difference that
the defendant did not participate in the forbidden
acts, or that no fraud or wrong was intended, or
resulted. The prohibition was laid on the commis-
sion as a body not to disburse the public funds to
the advantage or profit of its own membership, in
order to forestall enticement to subordinate the
public to private interest."

We further cite Meglemery vs. Weissinger, 151 S.W. 40, 51
L.R.A. (N.S.) 575, Ky. Apps; State vs. Bowman, 170 S.W. 700, Mo.
Apps; 46 C.J. 940.

It would be a dangerous precedent to set, to uphold contracts awarded by public boards and governing bodies to their individual members. Fundamentally, we can see little difference in principle between the award of a valuable contract and the award of a valuable position of personal service. No one would attempt to sustain a contract for the building of a dormitory let by the Board to one of its members. In this connection we cite Willis vs. Abbey, 27 Tex. 202; Flanikin vs. Foker, 15 Tex. 180; 10 Tex. Jur. 211; 13 C.J. 434, Sec. 43, and note 88; 6 R.C.L. 738.

It would seem useless to mention that a board member owes to the institution he serves his undivided loyalty and duty to avoid those situations where his private interest may conflict with that of his principal. It is plainly no answer to say that he was not present at the voting, or being present did not vote. The law contemplates that he shall maintain himself in such a position that he will be present and vote, without being embarrassed by personal interest. Whether in a given instance the member did actually succeed in completely submerging his personal interests is not a material inquiry. Public duty might triumph in a particular case, but such might not be true the next time and the next. Would we be willing for similar boards and governing bodies in any and all instances to fill appointive offices and places of employment by appointment of their own members? Will public policy permit us to sanction and recognize this practice as an approved method of obtaining appointments? It would tend to cause board members to look with covetous eyes on desirable positions. More than one might be seeking the same place, and personal jealousies would arise. Exchange of favors and the barter of places of public trust would be encouraged. If appointive places should come to be recognized as fair game for members of the appointing board, then there would inevitably be times when membership on the board would come far nearer to getting a man the appointment than all the qualifications he could possess.

The laws forbidding such appointments are founded on sound principles of public policy, and the fact that twice before in the annals of our state institutions of higher learning appointing boards have selected presidents from their own memberships is not a convincing reason for allowing it to be done again. The same strong public policy which dictated into the Penal Code a prohibition against the appointment of the brother, cousin or other relative within certain degrees of a board member, ought at least to invalidate the appointment of the member himself to the position, and we believe it does.

The Board of Directors of Texas Technological College is composed of a group of public spirited men and women who are outstanding in Texas for their sterling character and ability, and we are not in the slightest impugning their motives in the present instance, nor do we doubt for a moment the ability of the splendid man

they appointed to capably fulfill the duties of the president of this institution. We make no question as to the wisdom of the selection, other than the fact that the appointee was a member of the board. The fact that the law, a sound and salutory one, prohibited this appointment is the basis of our opinion. In the face thereof, we could not place our stamp of approval upon any and all other appointments and contracts which would fall within the purview of a contrary ruling.

The Board's minutes show that Mr. Jones, a director and Chairman of the Board, was present at the meeting. His election was proposed and defeated. The Board then recessed for fifteen minutes. When the Board re-convened after the recess a copy of a telegram sent by Mr. Jones during the recess tendering his resignation was exhibited as evidence of his qualification to accept the appointment. There was no claim that it had been accepted or that his successor had been appointed and qualified. In fact, such appointment and qualification of a successor during such brief period would have been physically impossible. The record evidencing Mr. Jones' appointment thus shows on its face that he was still a director, and that his appointment as president was illegal and void.

Mr. Steele's first question is answered in the negative. The second question needs no answer as it has been shown that Mr. Jones' resignation as director had not been effected at the time he was appointed president. The Comptroller's question is also given a negative answer.

We feel that we should mention that on September 24, 1938, Honorable Spencer A. Wells, Vice-Chairman of the Board, addressed to the Attorney General the question of whether the Board could legally appoint one of its own members as President of the College. The inquiry received two replies, the first dated September 27, 1938, and the second dated October 6, 1938. The first reply embodied the above quotation from Corpus Juris and indicated the opinion that such appointment could not legally be made. The second reply to the inquiry, indicating a contrary opinion, contained no citation of authorities, and was plainly predicated upon the understanding that the member would resign before the board should take action. As we have already noticed, it is quite clear that the member had not accomplished his resignation when this action was taken.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By Glenn R. Lewis

Glenn R. Lewis
Assistant

WRL:FG

APPROVED:

Gerald C. Mann

ATTORNEY GENERAL OF TEXAS